LOVELAND *v.* PETER.

1. ACCOUNTING—RECORD ON APPEAL.
    The record on appeal in a suit for an accounting should show what items were allowed and what disallowed, with exceptions pointing out the disputed items and the rulings of the court thereon. Either party may ask the court to follow this practice, and failure to do so may reasonably be treated as a waiver of the right to raise such questions by appeal.

2. PARTNERSHIP—ACCOUNTING—INTEREST ON ADVANCES.
    Upon a consideration of conflicting testimony in relation to the terms of an agreement entered into by defendant and complainant's intestate for the lumbering of certain lands, in

connection with testimony showing the manner in which the business was thereafter conducted, *held*, (1) that the parties were copartners in the venture; (2) that interest upon advances made by the defendant was properly charged to the intestate individually, rather than to the firm; and (3) that defendant was entitled to the mill culls as part of his saw bill, —HOOKER and MONTGOMERY, JJ., dissenting upon those items of the accounting.

Appeal from Saginaw; Wilber, J.   Submitted November 8, 1895.   Decided December 31, 1895.

Bill by Mark T. Bailey against William Peter for a partnership accounting.   Complainant died pending an appeal by the defendant, and the cause was revived in the name of his administrator, Ralph Loveland.   Decree modified and affirmed.

*George W. Weadock* (*Humphrey & Grant*, of counsel), for complainant.

*Geer & Williams*, for defendant.

HOOKER, J.   The complainant's intestate filed the bill in this cause for a partnership accounting.   The testimony was taken in open court, upon a hearing, wherein the fact of the partnership was disputed, and evidence was taken generally upon the condition of the business and accounts. It was not referred to a commissioner to state an account, nor has the circuit judge made any such statement of account in detail as enables us to determine the items of the account.

The decree determined:

1.   The existence of the partnership, and that complainant's intestate owned a one-third interest.

2.   It contains a list of real estate belonging to the firm, and decides that the partners are tenants in common therein.

3.   It includes a list of land contracts, in which it fixes complainant's interest at one-third of the money remaining unpaid thereon.

4. It determines that the parties had a settlement of account on November 10, 1879, and declines to open the account back of that date, and finds that there has been no settlement since that is binding upon the parties.

5. It contains a finding that interest was to be charged by the firm to the respective members upon their indebtedness to and advancements by the firm, and that it had been improperly computed against Bailey, complainant's intestate.

6. It determines that, after eliminating all improper entries and correcting the interest charges, there was due from defendant, Peter, to the company, the sum of $77,-955.03, and from Bailey the sum of $35,040.26, and that Peter owed Bailey upon these figures $2,624.84. This statement was held not to include—*First*, the lands and unpaid land contracts owned by the firm; *second*, an item for culls and shorts; *third*, an item for dry logs; and, *fourth*, a sum received by Bailey upon land contracts.

7. It was found that mill culls and shorts were sold by Peter, and not accounted for to the concern; that they should have been after 1879; and that for these, with the interest thereon, the sum of $16,831.59, over and above the saw bill and all other charges against the same, should have been credited.

8. That 200,000 feet of dry logs were delivered by Bailey at the mill boom, for which he had received no credit; that he was entitled to a credit of $5 per M. for such labor, together with interest from the date of delivery; that these logs were sawed by the defendant; and that, after he was paid $2.50 per M. for such sawing, the complainant would be entitled to one-third of the profits, amounting to a credit to the complainant and a charge against the defendant of $1,603.28.

9. The decree finds that Bailey received, upon land contracts, $4,459.55, of which Peter should be credited with two-thirds.

10. The sum of $5,865.62 is found due from defendant to the complainant, upon the whole record, in addition to

his interest as tenant in common in the lands and outstanding contracts.

The appellee asks us to dismiss this proceeding for the departure from the practice pointed out in *Barnebee* v. *Beckley*, 43 Mich. 613, where it is plainly intimated that accounting cases should come to this court upon a record showing what items are allowed and what disallowed, with exceptions pointing out the disputed items and rulings of the court thereon. As said in that case, "we might with entire propriety remand this case;" but, for similar reasons to those mentioned in that cause, we are disposed to pass upon such questions as we can reasonably consider. At the same time we desire to emphasize the rule laid down in *Barnebee* v. *Beckley* by saying that it must not be presumed that cases will be reviewed upon records made up in this way. Either party may ask the court to follow the practice pointed out, and failure to do so may reasonably be treated by us as a waiver of the right to raise such questions by appeal.

We gather from the briefs in this case that the appellant desires to retry the following questions: (1) The question of partnership; if we find a partnership, (2) the decision of the court in relation to interest; (3) the item for culls and shorts; (4) the item for dry lumber. To do this will require a further statement in relation to the facts. In 1868, Buck, Hollahan, and Bailey were engaged in lumbering. They had bought upon contract, from a Mr. Frost, a tract of pine land, upon which several thousand dollars had been paid, and a large sum remained unpaid. Bailey had paid $5,000 upon his one-third interest. The firm found itself pecuniarily embarrassed, and Bailey made an arrangement with Peter. Peter was a large manufacturer of lumber, being the owner of a mill at Bay City. According to the testimony of Bailey, an arrangement was made by which Peter bought out Buck and Hollahan, and took an assignment of the contract from Buck, Hollahan & Co., paying $7,015 to Buck and Hollahan and $500 to Bailey, who was to take charge of lum-

bering operations at a salary of $800 a year. Peter was to saw the logs at $2 per M., and the profits were to be divided, one-third to Bailey and two-thirds to Peter. It was further agreed that Peter was to advance money to do the lumbering, and was to receive interest upon it at 7 per cent. This arrangement was made in 1868 or 1869. In 1876 a new arrangement is said to have been made, by which Bailey was to deliver the logs at the boom and pay the boomage for $5 per M., and Peter was to have $2 or $2.50 for sawing, profits to be divided as before between the parties, and each was to have a corresponding interest in the land. Peter's version is somewhat different. He claims that he bought the premises from the company; that to one he paid $4,000, to another, $3,000, and to Bailey, $500, for their respective interests; and that he did this at the solicitation of Bailey, who desired to realize out of the venture by lumbering the land. He states that there was then $17,000 due Frost upon the contract, and that he arranged with Bailey that he (Peter) should take an assignment of the firm's interest and work up the lumber, advancing money to do the lumbering; that he was to have interest upon his money advanced, and, after he should get his money out, the profits remaining should be divided as stated. He asserts that there was no agreement for a partnership, nor any understanding that Bailey should have any interest in the lands, further than he always understood that, when the lands were sold, the money received would go into the fund to be divided. He admitted that he took the title for security.

We will next examine the testimony with relation to what was done. Bailey proceeded to lumber these lands, and deliver the logs at the boom, from which, in due time, Peter received them, sawed them, and sold the lumber. The bookkeeping was done by Peter, who opened an account upon his private books in the name of these lands, *i. e.*, "Tobacco River Lands." All moneys expended for the purchase of lands, taxes thereon, and cost of marketing the lumber were charged, while the account

was credited with amounts received from the lumber. Afterwards this account was changed in name to Peter & Bailey. Bailey was charged with moneys advanced, and Peter credited.. After portions of the land were lumbered, they were sold on contract. Bailey usually negotiated such sales, and Peter executed the contracts. Bailey collected some, if not most, of the moneys paid upon such contracts, and kept some sort of an account of the same. At the settlements mentioned, up to 1879, balances were struck on the basis of one-third of the profits to Bailey.

We think that, upon this testimony, the parties should be held to be partners. The agreement was not in writing, and we are satisfied that the complainant's interest of $5,000 in the land contract was not surrendered for $500. The defendant put in $7,500, and, deducting the $500, the complainant had in $4,500, which was more than one-third of the gross sum. So that he appears to have been entitled to at least a third interest upon an equitable apportionment, had the parties sought to make one. Again, though Bailey was paid for lumbering, there is nothing to indicate that he received pay for anything beyond the actual value of his labor, unless it was through profits expected to be made, but necessarily uncertain. True, the assignment of the contract was made to defendant, but there was nothing unnatural in that, for he was to invest $7,500 in cash, and give his personal paper for $17,000 more, and he might reasonably ask security of some sort from one who was confessedly impecunious. Indeed, his own testimony shows that he did take it for security. The fact that only profits were mentioned is not conclusive that there was no partnership. Each had an interest in the capital, and, with the other facts stated, there is no doubt in our minds that the arrangement made the parties partners.

*The Question of Interest:* The circuit judge found that the advancements to Bailey were made by Peter & Bailey, and that each partner was to pay interest to the

firm, when indebted to it, and that the firm was to pay interest to either partner who should advance money for the use of the business. Counsel for the defendant say that the testimony warrants no such conclusion, and shows that the parties made no such contract, but, on the contrary, the arrangement was that the advancements should be made by Peter to Bailey, who should pay interest until such advancements were repaid. Bearing in mind that the arrangement under which the lumbering was done, previous to 1876, was that Bailey should have a salary, it cannot be said that advancements to pay the expenses of lumbering were advancements to him. There was no obligation at that time resting upon Bailey to deliver the logs for a given price, but he was to give his time to the firm for $800 a year. The advancement contemplated, then, must have been an advancement for their mutual benefit, and, as the judge says, the conclusion is irresistible that it was for the firm. It covered, not only Bailey's salary, but all moneys expended by the company on joint account, and Bailey's testimony, quoted in appellant's brief, shows it. It is as follows: •

"*Q.* Who furnished you with the means with which to do the lumbering that season (*i. e.*, 1870)?

"*A.* Peter; William Peter.

"*Q.* What was the arrangement about his receiving pay *from the company* for his advances?

"*A.* He was to have 7 per cent. interest *for all money put into the concern, until it was paid.*"

It can hardly be said that Bailey should pay Peter interest upon all this, until they should adjust their accounts, and it would be as unjust to say that it was not a legitimate claim in Peter's favor against the company. And we may add that, when the concern received money sufficient to pay these advances, if they were appropriated by Peter, the effect should be to stop interest. The evidence shows that Peter received most of the money from the lumbering operations. Apparently, he kept it with his own moneys, using it in any way he chose, but keeping account of what

money he received from the business, and what he paid out for it. We infer that he may `have charged interest upon such payments as advancements for long periods, when a statement of receipts and expenditures would have shown that he had money in his hands belonging to the firm. Indeed, it seems probable that, after the first season's operations, the concern had money, unless by reason of the purchase of Flint & Pere Marquette lands or the payment of the balance due on the Frost contract, both of which were charges against the firm. These might have reduced the surplus, and perhaps required advancements which would entitle Peter to interest; but the advancement would in such case be to the firm, and it should pay the interest.

We repeat, therefore, that the testimony and the situation show that Peter did not loan Bailey money, but that he loaned the firm money, for its operations, some of which money found its way to Bailey for his salary, and, after 1876, to pay the expenses of cutting and hauling timber upon his contract, and that such sums as he received for these purposes after 1876, if paid before due, were advancements by the company, to which he should pay interest, and which advancements ceased to be such, as to him, when the amount was earned by delivery of the logs, though they might still be advancements by Peter to the firm, or might not, depending upon the state of the firm funds in Peter's control. The conclusion reached by the circuit judge was, in our opinion, right upon this branch of the case, so far as the method of charging and computing interest is concerned. Whether he should have allowed some items of interest that he denied, we cannot tell, as we are not pointed to disputed items. We think it probable, however, that his computation was right; it being determined that he was right in regard to the basis upon which he seems to have made it.

The decree allowed the complainant an item of $5,610.53

on account of mill culls and shorts. The defendant claims that it was agreed at the outset that he should have them, and that Bailey repeatedly settled without claiming anything for them. On the other hand, Bailey denies any arrangement with regard to them, and it appears from defendant's testimony that they were valuable, and that he took them and kept no account of them. If this is so, the accounts would contain no indication that they were thus appropriated, excepting by the absence of such items. There is testimony tending to show that, when the parties commenced work, culls were considered worth nothing more than the saw bill, and usually went to the mill, but that subsequently they became quite valuable. We see no reason for disturbing this conclusion of the circuit judge, who evidently believed Bailey's testimony, and properly held it to be a duty of Peter to account to his partner for the profits upon culls and shorts after 1879.

We are also of the opinion that the court was justified by the evidence in allowing the item for 200,000 feet of dry lumber.

It is urged that the complainant should be bound by the settlements from year to year. As stated, he is bound by the settlement of 1879, the circuit court having so held, and no appeal having been taken by him; but we think that is going far enough. This record does not clearly show fair dealing by Mr. Peter. It is significant that, in several particulars, he has obtained an advantage over his partner. His method of bookkeeping is not to be commended, and could hardly fail to raise complex and perplexing questions between the partners, especially if they were not expert accountants, as, apparently, Bailey, at least, was not. The alleged settlements, in our opinion, fall short of transactions showing a fair and complete understanding and voluntary adjustment, but rather indicate statements furnished to Bailey. It appears that he protested from time to time, and we see no such equities in defendant's favor as to call for denying the

complainant his share of hard-earned profits, because of these transactions.

We concur in the view taken by the circuit judge, whose decree should be affirmed.

MONTGOMERY, J., concurred with HOOKER, J.

LONG, J. I am unable to agree with my Brother HOOKER upon some of the items which are charged in the account against the defendant and upon some of the items stricken from defendant's claim. It appears that when the lumbering commenced, in 1868, Mr. Peter was to have $2 per M. for sawing. The logs were taken to his mill and manufactured into lumber. From that time up to 1876 Mr. Bailey continued to do the lumbering upon money furnished by Peter. Settlements were had from time to time. In such settlements Mr. Bailey was charged with interest on money advanced by Peter to do the lumbering, and for such interest money Mr. Bailey settled and paid. During this time, also, Peter kept and retained the mill culls as a part of his saw bills, and the settlements were made in accordance with such statements. No complaint, so far as the record discloses, was made by Mr. Bailey about the mode of keeping the accounts, or, if there was any complaint, the matters of difference were settled and receipts passed. In 1876, from Mr. Bailey's testimony, it appears a new arrangement was made about lumbering. At that time Bailey commenced to put the logs in at $5 per M. Thereafter the lumbering was continued and Bailey given credit for the amount of his bills at $5 per M., Peter furnishing the moneys to carry on the lumbering operations. Again Bailey was charged with interest on the moneys so advanced, and Peter took the mill culls as part of his saw bills. It is admitted by Bailey that a settlement was made in 1879 on this basis,—that is, by charging him interest in the account for moneys advanced by Peter, and that Peter kept the mill culls as part of his saw bills. The court below held that the settlements were binding

up to 1879, and my Brother HOOKER so treats them. It is only since that date that the settlements are opened, and the court below eliminates the interest account from Peter's account, and also charges to Peter the value of the mill culls.

In my judgment this is erroneous. No new contract was made with reference to interest or the mill culls. The original arrangement as to the lumbering by Bailey and the sawing by Peter was not in writing, but what the arrangement was is evidenced by the settlements. Mr. Bailey testified that in 1868, when he began lumbering, there was nothing said about mill culls; that he did not claim anything about mill culls until 1876, and that in 1876, when he made the arrangement to put in the logs at $5 per M., nothing was said between Peter and himself with reference to mill culls; that there was no charge made by Peter for sawing mill culls; that in January, 1884, his son, acting for him, and Mr. Young, acting for Mr. Peter, had a settlement and struck a balance, and a statement was rendered to him; that the same thing occurred in 1885, showing a balance up to January 1, 1886, and that that was the last time they had a settlement; that in 1887 and 1888 there was not much business done; and that on May 22, 1889, Mr. Young rendered an account which showed a balance due Mr. Peter, and that at that time he objected that he had not been paid for the mill culls. It therefore appears that, from 1868, Peter had gone on charging interest to Bailey for the advances made to him, and had been keeping the mill culls, and settlements were made in accordance therewith up to 1879, and that thereafter the same method of bookkeeping was pursued. Mr. Bailey knew the facts, made settlements in accordance therewith, and even when the contract was changed in 1876, and he commenced lumbering by the thousand, he made no claim to the mill culls or that he should not be charged interest. Mr. Peter testified that settlements were made in accordance with the terms of the contract, and I think the testimony is quite conclusive

upon the subject of interest and mill culls, when taken in connection with the settlements, which must, in my judgment, be taken as the construction which the parties themselves put upon it. I am of the opinion, therefore, that Peter should be allowed the interest charged, and that he should not be charged with the mill culls.

I do not desire to discuss the other questions, as, with these corrections, no injustice would be done. I think the decree should be modified to this extent, with costs to defendant.

McGRATH, C. J., and GRANT, J., concurred with LONG, J.